582 A.2d 33

**Charles L. EISENHAUER and Margaret B. Eisenhauer, Assignees of Char Mar, Inc., Appellants,**

**v.**

**CLOCK TOWERS ASSOCIATES and The Karsan Group, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 4, 1990.

Filed Nov. 8, 1990.

240

Jeffrey B. Rettig, Harrisburg, for appellants.

George C. Werner, Lancaster, for appellees.

Before MONTEMURO, JOHNSON and CERCONE, JJ.

MONTEMURO, Judge:

Appellants Charles and Margaret Eisenhauer brought this action for conversion and unjust enrichment against appellees Clock Towers Associates, The Karsan Group, Inc.,

Irwin Terach, Barry Lyman and Julian Levin. At the close of plaintiffs-appellants' evidence in a non-jury trial, the trial court granted appellees' request for a compulsory nonsuit. Appellants bring this appeal from the trial court's denial of their request for removal of the nonsuit. We hold that the trial court erred in granting the nonsuit, and reverse and remand this case for further proceedings.

The testimony at trial established the following facts. In March, 1983, appellant Charles Eisenhauer was the principal stockholder and president of Char Mar, Inc., trading as C & M Company ("C & M"), a company which designed and installed heating, ventilating and air conditioning systems in commercial and residential buildings. C & M was hired as a subcontractor by Sol Gillman, a general contractor, to furnish and install heat pumps in the Clock Tower Apartments, owned by appellees Clock Tower Associates. The apartment building was managed by The Karsan Management Company, of which appellee Julian Levin was the president.

The initial contract between Gillman and C & M provided that C & M would receive $345,300.00 in return for the installation of the 135 heat pumps. C & M then offered Gillman a discount on the cost of the heat pumps, provided that Gillman pay for the entire order upon delivery. According to Mr. Eisenhauer, Gillman accepted C & M's offer, but when the 135 units were delivered to the Clock Towers construction site, Gillman denied that he had agreed to pay for all of the units in full upon delivery and refused to pay for the units when presented with the invoice. C & M thereafter billed Gillman in accordance with the terms of the initial agreement, that is, on a monthly basis for labor, equipment and material as the work was performed. The heat pumps and some other accessory equipment were stored in an area on the job site under lock and key; Charles Eisenhauer and his foreman were the only people who had access to the storage area. The equipment was used by C & M as the job progressed.

This arrangement continued from March, 1983 until May, 1984, when a dispute arose between Gillman and Clock

Towers. Gillman was terminated as the general contractor of the job, and neither Gillman nor C & M was permitted further entry onto the site. Despite C & M's requests for the return of the equipment stored at the Clock Towers job site, Clock Towers refused to allow C & M to recover the equipment, maintaining that Gillman had been paid in full for all services rendered and materials supplied and thus Clock Towers owned all materials and equipment at the site.

In May, 1985, appellants, as assignees of C & M, filed this suit against appellees in which they presented a cause of action for conversion and for unjust enrichment arising out of appellees' refusal to return the equipment left on the site. The complaint requested damages in the amount of $66,814.12 plus interest.

In May, 1986, appellants filed a separate suit in federal court against Gillman, seeking damages for (1) the uninstalled equipment left on the job site, (2) work performed which had never been paid for by Gillman, (3) loss in profits suffered because of the breach in the agreement, and (4) loss of financial reputation. The total claim for damages against Gillman amounted to $237,939.38 plus interest. Although judgment was entered against Gillman in the federal suit in the amount of $125,000, C & M entered into a settlement agreement with Gillman in which Gillman agreed to pay C & M $90,000.00 by a certain date in return for the Eisenhauers' release of Gillman from any liability arising out of the Clock Towers project.

Following the close of plaintiffs' case, the trial court sustained appellees' motion for a nonsuit on behalf of the three individual defendants on the basis that appellants failed to establish that they were the general partners of Clock Towers Associates. The court also sustained a motion for nonsuit in favor of appellees Clock Tower Associates and Karsan Group on the basis that appellants had already recovered or settled for the same claim in the federal suit against Gillman. Although the court at first rejected appellees' request for a nonsuit on the basis that appellants did not have an ownership interest in the equip-

ment left at the site, in its Opinion in support of the non-suit, the trial court found that appellants had transferred their ownership rights in the equipment to Gillman when they had initially billed him for the complete order of 135 heat pumps, *see* Trial Court Opinion, March 3, 1990 at 6, and thus appellants could not sustain their cause of action for conversion.

In reviewing a grant of a compulsory non-suit, we are cognizant that:

[i]t has long been settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. The plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence. Any conflict in the evidence must be resolved in favor of the plaintiff ... We must therefore review the evidence to determine whether the order entering judgement of compulsory nonsuit was proper. *Coatesville Contractors and Engineers, Inc. v. Borough of Ridley Park*, 509 Pa. 553, 559–60, 506 A.2d 862, 865 (1986) (citations omitted); *Corbett v. Weisband*, 380 Pa.Super. 292, 551 A.2d 1059 (1988).

*Gorfti v. Montgomery*, 384 Pa.Super. 256, 261–62, 558 A.2d 109, 112 (1989), *alloc. denied*, 524 Pa. 608, 569 A.2d 1367 (1989).

■ We first address appellees' argument that appellants' claim for conversion must fail because appellants lacked a sufficient interest in the heat pump systems to maintain a cause of action for their conversion. "Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shonberger v. Oswell*, 365 Pa.Super. 481, 484, 530 A.2d 112, 114 (1987), *citing Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964). When such an act occurs, the plaintiff may bring suit if he or she had either actual or constructive possession, or an immediate right to possession of the chattel at the time of the conversion. *Bank of*

*Landisburg v. Burruss,* 362 Pa.Super. 317, 321, 524 A.2d 896, 898 (1987), *alloc. den.* 516 Pa. 625, 532 A.2d 436 (1987); *Potts Run Coal Co. v. Benjamin Coal Co.,* 285 Pa.Super. 128, 135, 426 A.2d 1175, 1178 (1981).

Appellees argue that appellants transferred their property rights in the heat pumps and other equipment when the 135 heat pumps were delivered to the job site and C & M invoiced Gillman for the entire 135 units. Appellees rely on the Uniform Commercial Code, 13 Pa.C.S.A. § 2401(2), which provides that:

> ... title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ...:
>
> > (i) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
> >
> > (ii) if the contract requires delivery at destination, title passes on tender there.

13 Pa.C.S.A. § 2401(2)(i), (ii).

We find that appellees' argument is flawed in several respects. First, appellees misread the law of conversion. It is well-settled that a person seeking to recover on a theory of conversion need not be the owner of the property claimed to be converted, provided that the plaintiff is in possession or entitled to be in possession at the time of the conversion. *Gunzburger v. Rosenthal,* 226 Pa. 300, 75 A. 418 (1910); *Bank of Landisburg, supra;* 18 AmJur2d §§ 57, 75, 76; Prosser & Keeton, *Torts,* § 15 (5th ed. 1984); *Restatement (Second) Torts,* §§ 224A, 225. Thus, even if Gillman did possess title to the equipment at the time of the alleged conversion, appellants may bring this action for conversion, as the testimony at trial established that the heat pumps were in the sole possession of C & M when C & M was terminated from the job and not permitted to return to the site. Mr. Eisenhauer testified that the equipment was kept in a locked storage area to which only he and his

foreman had a key. Neither Gillman nor Clock Towers had access to the equipment.

■ Further, even if appellees' position that plaintiffs must be the "owners" of the equipment was correct, we find that plaintiffs' evidence does not show that C & M had transferred title of the heat pumps to Gillman. Although Mr. Eisenhauer testified that Gillman had agreed to pay for the entire order of heat pumps upon their delivery in exchange for the discounted fee, appellants offered contradictory evidence in the form of Gillman's deposition testimony wherein Gillman denied any such agreement. The questioning went as follows:

Q. Mr. Rettig [counsel for plaintiffs] has alluded to conversations you had concerning purchase of all the heat pumps in advance upon delivery by Char Mar. Is your testimony that you did not agree to that?

A. [by Mr. Gillman]: Absolutely.

Q. On what basis were they to be paid by? How was Char Mar to be paid?

A. Char Mar was to be paid as work was billed. He was to get paid once it was approved by our local guy.

Q. Did Char Mar company have an area where they store their equipment on the job site?

A. Absolutely, sir.

*    *    *    *    *    *

Q. Was it locked?

A. He had his own lock and key on it.

Q. Did Clock Towers Development Corporation have access to that area?

A. Absolutely not.

Q. Did Mr. Eisenhauer ever indicate that that was his equipment?

A. It was always his equipment. I had to sign a note for a bank. . . .

Q. Did he indicate it was his?

A. He borrowed the money; it was his. It had nothing to do with us. He was using the facility to store his

material. I was never in any way—If you ask me if I ever saw the material to this very day, I never saw it.

Q. It was made very clear by Char Mar and Mr. Eisenhauer that he retained ownership of that equipment that was on the site.

A. Absolutely was his. He accepted it, counted it, he did everything else.

N.T. July 6, 1989 at 70–72. Mindful that our cases direct us to resolve all conflicts in the evidence in favor of the plaintiff when reviewing a grant of a nonsuit, we must disagree with the trial court's conclusion that C & M had transferred its rights in the equipment upon billing Gillman. According to Gillman, C & M and he had never agreed on the alleged deal wherein Gillman was to make full payment for the equipment up front. In further support of this, both Mr. Eisenhauer and Gillman testified that Gillman paid C & M on a monthly basis as the work was performed. Further, the uncontradicted testimony at trial establishes that C & M never delivered the heat pumps to Gillman, but instead kept them under lock and key in an area to which only C & M had access. Thus the requirements of 13 Pa.C.S.A. § 2401(2) were never met and title never passed to Gillman. Therefore, even if appellants were required to establish that they owned the equipment in order to maintain their action for conversion, which we hold they were not, the evidence favorable to appellants shows that appellants were the owners of the equipment. The trial court erred in granting a compulsory nonsuit in favor of appellees on the basis that they had transferred their ownership interests in the equipment to Gillman.

We also find fault with the trial court's conclusion that appellants are barred from recovering in this case due to their release of Gillman in the federal case. Initially, we note that appellants claim that the trial court improperly granted the nonsuit because the release of Gillman in the federal suit was part of defendants-appellees' defense, elicited on cross-examination of Mr. Eisenhauer. While it is true that a grant of a nonsuit is improper where a defen-

dant has offered evidence during the plaintiff's case, *see* Pa.R.C.P. 230.1; *Storm v. Golden,* 371 Pa.Super. 368, 538 A.2d 61 (1988), our review of the trial transcript reveals that appellants presented evidence of the release during their case-in-chief. During direct examination, Mr. Eisenhauer testified that Char Mar had instituted suit in federal court against Gillman, seeking redress for work actually performed by C & M, for the cost of having to borrow money to finance the purchase of the heat pump units, and for loss of business opportunities. N.T. July 6, 1989 at 34–35. Eisenhauer testified further that the federal case was settled out of court for $90,000, and that the settlement figure did not include compensation for the uninstalled equipment left on the site. *Id.* At the close of plaintiffs' case, appellants' counsel moved for the admission of the release into evidence. *Id.* at 76. Without objection from appellants' counsel, appellees' counsel cross-examined Eisenhauer on the claims in the federal suit and the settlement agreement. This material was within the scope of cross-examination, as Eisenhauer had testified about the matters during direct examination. We therefore reject appellants' claim that the trial court improperly considered the release in granting the nonsuit.

■ We agree with appellants, however, that the court erred in holding that by virtue of appellants' settlement of the federal claim, they recovered the value for the lost equipment and are therefore barred from recovering from the appellees in this case. Under the terms of the release, appellants relieved Sol Gillman from further liability arising out of the Clock Towers Development project. The release states that the Eisenhauers:

> do not waive, but rather expressly reserve to themselves any and all rights that they may have against Clock Towers Associates.... Further, by entering into this Release, Charles Eisenhauer and Margaret Eisenhauer, his wife, are not compromising their claims for Char Mar equipment left at the job site and allegedly wrongfully converted without payment. Provided further, that in

consideration of the above payment and the mutual Releases contained herein, ... Charles Eisenhauer and Margaret Eisenhauer ..., will indemnify and hold harmless Sol Gillman and any of the Gillman entities recited above, ... from any damages which are now known or unknown, or arising in the future, of whatever nature, which may arise out of, or in connection with ..., any attempts by Charles Eisenhauer and Margaret Eisenhauer ..., seeking to obtain recovery for any amounts for equipment of Char Mar, Inc., allegedly converted at the Clock Towers project site.

R.R. at 002ap. Thus, although the settlement relieved Gillman of any liability for the uninstalled equipment left on the job site, the release in no way relieved Clock Towers of its responsibility for the uninstalled equipment. Clock Towers was not a party to the federal litigation giving rise to the release. The federal suit against Gillman was based on a theory of contractual liability, whereas the state suit against Clock Towers, et al, was based on the tortious liability of Clock Towers. Under comparable circumstances, our courts have held that a release discharging certain individuals does not relinquish the obligations of other entities not a party to the release or not a party to the litigation giving rise to the release. *See Buttermore v. Aliquippa Hospital,* 368 Pa.Super. 49, 533 A.2d 481 (1987) (where appellees were not parties to the negotiation of the release, were not named in the release, and did not provide any consideration to the appellant in connection with the release, the appellant did not intend to discharge his claims against the appellees by virtue of the release); *Sparler v. Fireman's Ins. Co. of Newark, N.J.,* 360 Pa.Super. 597, 521 A.2d 433 (1987) (en banc) (where release did not identify appellee insurance company as a party being discharged from claims, the only reasonable interpretation of the release was that the insured did not intend to release insurance company from its contractual obligations). We find that the trial court erred in granting a nonsuit on the basis

that appellants' release of Gillman in the federal suit bars appellants from recovering from appellees in this suit.

■ Finally, we find that the trial court erred in granting a nonsuit in favor of individual defendants Lyman and Terach on the basis that appellants failed to establish that these individuals were the general partners of Clock Towers Associates. The deposition testimony of Julian Levin indicated that Levin was the president of Karsan Management Company, an entity responsible for the management of the Clock Towers Apartments. Levin testified that Terach and Lyman "are the general partners of Clock Towers Associates." N.T. July 6, 1989 at 6. During argument in support of the nonsuit, appellees' attorney stated that Terach and Lyman were not the general partners. On the basis of this "evidence" presented during argument by the defendants-appellees' attorney, the court granted the nonsuit.

■ We find that the court erred in granting the nonsuit on behalf of individual defendants Lyman and Terach, because the court relied on evidence presented by the defendants. Under Pa.R.C.P. 230.1, once a defendant has offered evidence, entry of a nonsuit is improper. On this basis alone, the court erred in entering a nonsuit in favor of the individual defendants. Additionally, we note that in reviewing a grant of a nonsuit, we must resolve all conflicts in the evidence in favor of the plaintiffs. *Storm v. Golden, supra.* Because the plaintiffs' evidence showed that the individual defendants were general partners of Clock Towers Associates, entry of a nonsuit was improper.

For all of the foregoing reasons, we find that the trial court erred in entering a nonsuit in favor of defendants-appellees. Accordingly, we reverse and remand this case for further proceedings consistent with this decision.

Reversed and remanded. Jurisdiction is relinquished.